
Harsha Dalal
16 Trudy Drive
Lodi, NJ 07644
(201) – 712 – 0550
Plaintiff, *pro se*

FILED

2021 JUN 28 P 2: 53

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| HARSHA DALAL,<br><br>                                    Plaintiff,<br><br>Vs.<br><br>HORIZON HEALTHCARE SERVICES, INC. d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, and JOHN DOES 1-50,<br><br>                                    Defendants. | Docket No.: 2:21-CV-877-RDP<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## JURISDICTION & VENUE

1. The United States District Court for the Northern District of Alabama has jurisdiction pursuant to 28 U.S.C. § 1331, as this action is brought pursuant to the Sherman Antitrust Act of 1890, 15 U.S.C. § 1. This court has pendent jurisdiction over New Jersey state law claims pursuant to 28 U.S.C. § 1367(a).

2. Venue is proper pursuant to 15 U.S.C. § 22 as the Defendant corporation in this antitrust action can be found and transacts business in the Northern District of Alabama.

## PARTIES

3. Plaintiff Harsha Dalal ("Plaintiff") is a resident of New Jersey and a citizen of the United States.

4. Defendant Horizon Healthcare Services, Inc., which does business as Horizon Blue Cross Blue Shield of New Jersey ("Horizon"), is a New Jersey corporation. Horizon engages in substantial business in Alabama and has approximately 11,357 members and subscribers in Alabama.

5. Defendants John Does 1-50 are yet unknown officers and employees of Horizon.

## STATEMENT OF FACTS

### The Blue Cross Blue Shield Antitrust Class Action

6. On November 30, 2020, the Hon. R. David Proctor, U.S.D.J. of the United States District Court for the Northern District of Alabama preliminarily approved a settlement in the class action lawsuit of <u>In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406, N.D. Ala. Master File No.: 2:13-cv-20000-RDP</u> for approximately $2.67 billion, inclusive of attorneys' fees of over $667.5 million. The lawsuit raised claims of violations of federal antitrust laws based on the same facts stated herein.

7. Due to Plaintiff's purchase of health insurance coverage from Horizon during the relevant time period, Plaintiff was a member of the class in the aforementioned lawsuit.

8. On May 27, 2021, Plaintiff determined that the settlement was inadequate and timely opted out of the settlement by sending letters via certified and regular U.S. mail to the settlement administrator requesting exclusion from the class action.

### Plaintiff's Purchase of Health Insurance from Horizon

9. During and between March 1, 2019 and January 1, 2021 ("Subscription Period"), Plaintiff purchased and subscribed to a healthcare insurance plan issued by Defendant Horizon and paid a monthly premium to Defendant Horizon. The healthcare insurance plan was labeled the Omnia Silver Plan.

10. Plaintiff's payment of monthly premiums to Defendant Horizon between March 1, 2019 and January 1, 2021 totaled approximately $25,000.

### The Blue Cross and Blue Shield Association

11. Defendant Horizon is a licensee of the Blue Cross and Blue Shield Association ("BCBSA") and operates Blue Cross and Blue Shield plans throughout New Jersey. The BCBSA has approximately 36 licensees throughout the United States, including Defendant Horizon ("Blue Plans").

12. The BCBSA is an instrumentality of the individual Blue Plans, including Defendant Horizon, used for the purpose of restricting competition in the health insurance industry and thereby allowing the Blue Plans to increase their premiums and thereby their profits.

13. The BCBSA is a licensee-controlled entity and is funded, controlled, and operated by the Blue Plans, who receive licenses to use the BCBSA marks. The BCBSA

describes itself as an organization controlled by the Blue Plans. The Blue Plans are members of the BCBSA and pay monthly dues.

14. The BCBSA's Board of Directors consists of the CEOs of all the Blue Plans and the president of the BCBSA. The Blue Plans elect the BCBSA President. Directors may only be removed by a three-quarters vote of the Blue Plans. The BCBSA's bylaws may only be amended by a three-quarters vote of the Blue Plans.

15. The BCBSA's training materials for directors state, "Member Plans have the authority to establish or change the constitutional framework or matters that affect fundamental aspects of the Blue System." The Blue Plans further control the terms of each Blue Plan's license agreement.

### Horizon's Anticompetitive Commercial Practices

16. Prior to and during the Subscription Period, the Blue Plans, including Defendants Horizon and John Does 1-50, agreed to restrain competition in the health insurance industry in the United States through several methods: (1) territorial allocation, (2) output restrictions, (3) price fixing, (4) group boycotts, and (5) trademark restrictions. Each of these restraints individually and all of the restraints in the aggregate were intended to restrict and eliminate trade and commerce in the sale of health insurance in New Jersey and beyond.

17. The Blue Plans, including Defendants Horizon and John Does 1-50, engaged in anticompetitive conduct through the BCBSA.

18. During and prior to the Subscription Period, the Blue Plans, including Defendant Horizon, through the BCBSA, established exclusive service areas ("ESAs") by allocating geographic markets for the sale of commercial health insurance.

19. ESAs are territorial areas, which provide each Blue Plan, including Defendant Horizon, an enclave in which they can fix and increase prices free from any outside competition. The ESAs are designated in licensing agreements signed by each of the 36 Blue Plans. Under the licensing agreements, each Blue Plan has agreed that they "may not use the Licensed [Blue] Marks and Name outside the Service Area."

20. The BCBSA may impose a monetary fine on a Blue Plan that uses the marks and name outside the ESA. On a three-quarters vote by the Blue Plans, one Blue Plan's license may be terminated for engaging in business outside of its ESA.

21. Prior to and during the Subscription Period, the CEOs of various Blue Plans have stated that "[t]he major advantage of an exclusive franchise area [ESA] was seen in the lessening of competition," and that "Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans." The Blue Plans also determined that there would be only one Plan per state in order to reduce and eliminate competition. Blue Plan executives themselves have expressed concerns that the ESAs violate antitrust laws.

22. Prior to and during the Subscription Period, the Blue Plans, including Defendant Horizon, operated under the National Best Efforts rule, which was implemented through the BCBSA, and served as an output restriction. The National Best Efforts rule required that each Blue Plan derive at least 66.6% of its national

health insurance revenue from its Blue brand. Consequently, any revenue a Blue Plan may generate from services offered under any non-Blue brand is limited in relation to its Blue branded health revenue.

23. The National Best Efforts rule further limits the extent to which the Blue Plans can compete with Blue branded business under non-Blue marks.

24. Prior to and during the Subscription Period, the Blue Plans, including Defendant Horizon, implemented a horizontal price fixing scheme through the BlueCard program.

25. The BlueCard program eliminates price competition among the Blue Plans for medical care providers' services by (1) requiring a health care provider who desires to enter the BlueCard network (and serve as an in-network provider for a Blue Plan) to agree to accept certain provider rates from each Blue Plan, (2) requiring that the Blue Plans will refuse to pay any provider a different rate than the rate negotiated by the in-area Blue Plan, and (3) prohibiting the Blue Plans from negotiating separate contracting agreements with providers outside of their licensed areas.

26. The BlueCard program further serves as a group boycott, as the Blue Plans, including Defendant Horizon, agreed that each Blue Plan would not contract with medical care providers outside of their service areas.

27. Prior to and during the Subscription Period, the Blue Plans, including Defendant Horizon, implemented and operated under trademark uncoupling rules. The uncoupling rules prevented the Blue Plans from using a trade name with the Blue

Marks and then using the same trade name to sell another health care service product without the Blue Marks.

28. The Blue Plans' anticompetitive conduct, through BCBSA, allowed Defendants Horizon and John Does 1-50 to inflate Plaintiff's insurance premium by reducing competition in the healthcare insurance market and thereby resulted in economic losses to Plaintiff.

29. Plaintiff suffered losses of approximately $25,000 as a result of Defendant Horizon's anticompetitive conduct and unconscionable commercial practices.

## STATEMENT OF CLAIMS

### COUNT I: VIOLATION OF THE SHERMAN ANTITRUST ACT

30. Plaintiff again alleges and incorporates by reference all previous paragraphs set forth above in this complaint.

31. During and between March 1, 2019 and January 1, 2021, Defendants Horizon and John Does 1-50 engaged in a contract, combination, or conspiracy to restrain trade and commerce among the several states, which directly and proximately caused Plaintiff a loss of approximately $25,000.

32. Defendants Horizon and John Does 1-50 violated the Sherman Antitrust Act of 1890, 15 U.S.C. § 1, and are liable for damages under 15 U.S.C. § 15(a).

### COUNT II: VIOLATION OF THE NEW JERSEY ANTITRUST ACT

33. Plaintiff again alleges and incorporates by reference all previous paragraphs set forth above in this complaint.

34. During and between March 1, 2019 and January 1, 2021, Defendants Horizon and John Does 1-50 engaged in a contract, combination, or conspiracy to restrain trade and commerce in New Jersey, which directly and proximately caused Plaintiff a loss of approximately $25,000.

35. Defendants Horizon, BCBSA, and John Does 1-50 therefore violated the New Jersey Antitrust Act, N.J.S. 56:9-1 *et seq.*, and are liable for damages.

## DEMAND FOR RELIEF

Plaintiff petitions this Court for judgment as follows:

a) Finding that Defendants Horizon and John Does 1-50 committed the acts or omissions set forth in this Complaint;

b) Finding that such acts or omissions constitute violations of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 and the New Jersey Antitrust Act, N.J.S. 56:9-3;

c) Granting Plaintiff appropriate equitable relief, including preliminary and permanent injunctive relief barring Defendant from engaging in the anticompetitive practices outlined in this Complaint;

d) Granting Plaintiff compensatory damages of $25,000 or an amount to be determined by a jury;

e) Granting Plaintiff treble damages in accordance with 15 U.S.C. § 15(a) and N.J.S. 56:9-12;

f) Granting Plaintiff punitive damages in an amount to be determined by a jury;

g) Granting Plaintiff nominal damages;

h) Granting Plaintiff reasonable attorneys' fees, expenses, and costs in accordance with 15 U.S.C. § 15(a) and N.J.S. 56:9-12; and

i) Affording Plaintiff any other relief deemed just and appropriate by the Court.

## JURY TRIAL DEMAND

Plaintiff demands trials by a jury on all of the triable issues of this complaint.

                                                                                              _H. A. Dalal._  
                                                                                              Harsha Dalal  
                                                                                              Plaintiff, *pro se*

Dated:       June 18, 2021

10